UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VICTOR RIVERA,

                Plaintiff,

                -v.-

BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK, *a/k/a*
THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                Defendant.

19 Civ. 11624 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Victor Rivera, a public school teacher, brings suit against his employer, Defendant New York City Department of Education (the "DOE"), pursuant to 42 U.S.C. § 1983, for race- and national origin-based discrimination and retaliation at his school. In this second round of motion practice, Defendant seeks to dismiss Plaintiff's Amended Complaint for his failure to plausibly allege: (i) the existence of a discriminatory policy or practice that can be attributed to the DOE or (ii) sufficiently severe or pervasive conduct to sustain a hostile work environment claim. For the reasons set forth in the remainder of this Opinion, the Court grants Defendant's motion.

## BACKGROUND[1]

### A.    Factual Background

Plaintiff identifies as an Hispanic man of Latino-Puerto Rican heritage. (Am. Compl. ¶ 9). He began working as a history teacher at A.P. Randolph

---

[1]    The facts in this Opinion are drawn from Plaintiff's Amended Complaint ("Am. Compl." (Dkt. #23)), the well-pleaded allegations of which are taken as true for purposes of this

High School (the "School") in or around 2010. (*Id.* at ¶ 14). Approximately one year after Plaintiff began teaching at the School, David Fanning was named the School's principal. (*Id.* at ¶ 18). Around the same time in 2011, Plaintiff was elevated to a School dean position. (*Id.* at ¶¶ 15, 18). During Plaintiff's tenure as dean, his direct supervisor was the School's Head of Security, Rhonda Pekow. (*Id.* at ¶ 15). Plaintiff's deanship ended following the 2015-2016 academic year, but he has continued to teach at the School. (*Id.* at ¶¶ 35-36). From the 2018-2019 academic year through the present, Plaintiff's immediate supervisor has been the School's Assistant Principal of the Humanities Department, Kierra Foster-Ba. (*Id.* at ¶¶ 42, 76).[2] Plaintiff alleges that he has experienced a hostile work environment throughout his tenure at the School.

### 1.    Allegations of Discrimination from 2011 to 2016[3]

Plaintiff asserts that since Fanning became principal in 2011, he "condoned and, in fact, fostered an environment replete with racial bias." (Am.

---

motion. *See Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). The Court also relies on the exhibits attached to the Declaration of Christin M. Nierman submitted in support of Defendant's motion to dismiss ("Nierman Decl., Ex. [ ]" (Dkt. #30)), as they consist of pertinent court filings of which the Court may take judicial notice. *See In re Enron Corp.*, 379 B.R. 425, 431 n.18 (S.D.N.Y. 2007); *see generally* Fed. R. Evid. 201.

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #31); Plaintiff's opposition to Defendant's motion to dismiss as "Pl. Opp." (Dkt. #34); and Defendant's reply brief as "Def. Reply" (Dkt. #35).

[2]    The Court was unable to locate Foster-Ba's first name in the record on this motion, but obtained it from the School's webpage. *See* https://www.aprandolph.com/apps/staff/ (last visited Nov. 15, 2021).

[3]    In its Order of December 21, 2020, the Court granted Defendant's first motion to dismiss based on the untimeliness of Plaintiff's claims that accrued prior to December 19, 2016, or three years prior to the filing of the Complaint. (Dkt. #21). In that same Order, the Court granted Plaintiff leave to amend his pleadings to include timely allegations in support of his hostile work environment claims. (*Id.* at 26).

Compl. ¶ 21).  Plaintiff alleges that Fanning has engaged in several different
forms of discrimination directed at Plaintiff and others at the School.  For one,
Plaintiff claims that Fanning has repeatedly stereotyped minority students,
including by referring to them as "ghetto" and pronouncing that such students
would "never amount to anything positive."  (*Id.* at ¶ 22).  Plaintiff also notes
that he has been a target of Fanning's discriminatory ire on numerous
occasions, one manifestation of which was Fanning's singling Plaintiff out for
heightened scrutiny and surveillance.  (*Id.* at ¶¶ 26-27).  According to Plaintiff,
Fanning "instructed many of the administrators at the School to follow and
stalk [Plaintiff] during work hours in an effort to watch over [him]."  (*Id.* at
¶ 28).  Plaintiff further alleges that Fanning has often treated him differently
than his non-Hispanic colleagues, for example, by affording others "better
professional opportunities and equipment to fulfill their job duties."  (*Id.* at
¶ 30).  Throughout this period, Plaintiff states that he lodged verbal complaints
to his superiors about Fanning's discriminatory conduct, but that no action
was ever taken against Fanning.  (*Id.* at ¶¶ 31, 33-34).

####    2.    Allegations of Discrimination from 2017 to the Present

After completing his service as a School dean, Plaintiff continued to teach
during the 2016-2017 academic year, but the situation at the School did not
improve.  (Am. Compl. ¶ 36).  Confronted with what he describes as a "caustic
and unlivable work environment," Plaintiff opted to go on sabbatical for the
2017-2018 school year.  (*Id.* at ¶ 38).  On or about September 25, 2017, while
on sabbatical, Plaintiff served a Notice of Claim upon Defendant and Fanning,

alleging discrimination based on Plaintiff's race and national origin and retaliation in response to Plaintiff's complaints against Fanning's discriminatory conduct.  (*Id.* at ¶¶ 4, 40).  On or about December 21, 2018, Plaintiff commenced an action in the New York State Supreme Court, New York County, alleging race discrimination and retaliation against Defendant and Fanning.  (*Id.* at ¶¶ 6, 41).[4]

Upon his return from sabbatical at the beginning of the 2018-2019 academic year, Plaintiff continued to feel that he was being "treated as a second-class citizen in the workplace."  (Am. Compl. ¶¶ 42-44).  As discussed in greater depth below, Plaintiff alleges that Fanning continued to discriminate against him in several ways, including by: (i) making derogatory comments about Plaintiff; (ii) personally escalating his surveillance of Plaintiff; (iii) exerting pressure on others to lower Plaintiff's job performance ratings; (iv) assigning Plaintiff an inordinate number of undesirable work assignments; (v) denying Plaintiff access to School resources that he afforded to others; and (vi) rejecting Plaintiff's application to serve a second term as a School dean.

*First*, Plaintiff alleges that Fanning and Pekow made multiple derogatory and racist comments about him, both in and out of Plaintiff's presence.  For instance, Plaintiff alleges that Fanning remarked to School colleagues that Plaintiff did not "have the balls" to return to the School after his sabbatical.

---

[4]     On October 21, 2019, after nearly a year of litigation that included motion practice, Plaintiff's state court case was terminated with the filing of a stipulation of dismissal. (*See* Nierman Decl., Ex. B; *see also* Am Compl. ¶ 7).  This stipulation dismissed Plaintiff's claims against Fanning with prejudice and those against the DOE without prejudice.  (*See* Nierman Decl., Ex. B).

(Am. Compl. ¶ 43).  As another example, in or around September 2019, Plaintiff sustained injuries to his head and face after breaking up a fight between two students.  (*Id.* at ¶¶ 55-56).  Despite the School principal's usual practice of lending support to staff involved in such an altercation, Fanning declined to do the same for Plaintiff, stating, "I have no time to console that Black Puerto Rican, he is tough."  (*Id.* at ¶¶ 57-58).  And in or around September 2019, Plaintiff learned of several disapproving comments made by Pekow about Plaintiff's interracial relationship, including: "[Plaintiff] has no business dating such a beautiful woman, he is too black for her"; "can you imagine if they have babies?"; and it was "disgusting to see them walking together."  (*Id.* at ¶¶ 70-71).  After Plaintiff reported these comments to Fanning and Foster-Ba, Fanning said he would investigate the incident; but, according to Plaintiff, Fanning never did anything to investigate the incident.  (*Id.* at ¶¶ 72-73).  By way of a more recent example, in or around June 2020, Plaintiff alleges that Fanning responded to Plaintiff's and others' urging for the return of senior dues to students at the School by saying, "[t]hese Black people, all they know is how to complain!"  (*Id.* at ¶ 88).

*Second*, Plaintiff alleges that Fanning escalated his surveillance of Plaintiff at the School.  According to Plaintiff, upon his return from sabbatical, Fanning personally began to "lurk outside of [his] classroom" and "eavesdrop on [his] lessons," in what Plaintiff interpreted as an attempt to intimidate him. (Am. Compl. ¶¶ 45-46).  Plaintiff alleges that Fanning's scrutiny of Plaintiff

prompted some students to comment "on how weird they found Fanning's behavior." (*Id.* at ¶ 45).

*Third*, despite customarily receiving ratings of "highly effective" prior to going on sabbatical, Plaintiff received "lower than average" ratings on his classroom observation reports throughout the 2018-2019 school year, which negatively impacted the grade on his overall yearly evaluation. (Am. Compl. ¶ 47). When Plaintiff inquired of Foster-Ba about his surprisingly poor ratings, she admitted they were due to pressure from Fanning, who was "vehemently opposed to issuing Plaintiff effective and/or satisfactory ratings, even when such ratings were earned and warranted." (*Id.* at ¶¶ 48-50).

*Fourth*, Plaintiff alleges that Fanning tasked him with an excessive number of undesirable work assignments. Teachers at the School considered serving as a scorer for the annual Regents exam to be a "loathsome job" for its tediousness, logistical complexity, and travel requirements. (Am. Compl. ¶ 52). Plaintiff alleges that in recognition of the nature of the job, Fanning's usual practice was to rotate teachers off the assignment. (*Id.* at ¶ 53). According to Plaintiff, however, during the 2018-2019 school year, Fanning refused to rotate Plaintiff off the job, and selected him twice a year for Regents grading. (*Id.* at ¶ 54).

*Fifth*, Plaintiff avers that Fanning ignored or dismissed multiple of his proposals to institute student extracurriculars or initiatives aimed at teaching and celebrating diversity, despite being willing to support programs proposed by other faculty. (Am. Compl. ¶¶ 59-67). More specifically, in or around

December 2019, Plaintiff raised the possibility of restarting the School's previously successful Law Team, which request Fanning ignored.  (*Id.* at ¶¶ 59-62).  Fanning also refused to fund or support Plaintiff's proposed anti-racist curriculum, as well as the APTALKS program, which Plaintiff designed to train students to conduct research and give presentations.  (*Id.* at ¶¶ 64, 75-78).  Foster-Ba told Plaintiff that "under no circumstances would [Fanning] support any endeavor of Plaintiff's, and would not allow Plaintiff to rise in the ranks at the school," because "Plaintiff spoke out against [Fanning]."  (*Id.* at ¶ 65).

*Finally*, Plaintiff alleges that Fanning denied him promotional opportunities.  Upon learning of Plaintiff's interest in applying for a second deanship for the 2019-2020 academic year, Fanning announced at a meeting with other assistant principals that Plaintiff would "never be able to sit at that table with him," and that Plaintiff — along with others who had spoken out against Fanning — "did not have a chance" at being promoted.  (Am. Compl. ¶¶ 81-83).  When Plaintiff applied for dean this second time, his application was not considered and the position went to someone whom Plaintiff believes to be Caucasian woman.  (*Id.* at ¶ 85).

Plaintiff contends that Fanning continues to display hostility toward minorities, especially those who have complained about him.  (Am. Compl. ¶¶ 86-87).  Plaintiff notes that in addition to his own complaints about Fanning, at least four of Plaintiff's current or former colleagues have also complained about discrimination and retaliation at the School, and that

Fanning's conduct has been the impetus for "multiple lawsuits" against the DOE brought by School employees.  (*Id.* at ¶¶ 94-95).

## B.    Procedural History

Plaintiff filed the initial Complaint in this action on December 19, 2019, asserting Section 1983 claims against Defendant DOE based on theories of race and national origin discrimination, retaliation, and failure to hire.  (Dkt. #1).  On March 12, 2020, Defendant moved to dismiss the original Complaint on the grounds that many of Plaintiff's claims were time-barred.  (Dkt. #12-14).  By Opinion and Order dated December 21, 2020, the Court granted Defendant's motion to dismiss, but permitted Plaintiff leave to file an amended complaint with timely allegations supporting his hostile work environment claims.  (Dkt. #21).  *See Rivera* v. *Bd. of Educ. of City Sch. Dist. of City of N.Y.*, No. 19 Civ. 11624 (KPF), 2020 WL 7496282 (S.D.N.Y. Dec. 21, 2020) ("*Rivera I*").

On January 15, 2021, Plaintiff filed the Amended Complaint, which asserts three claims of hostile work environment, predicated on race discrimination, national origin discrimination, and retaliation.  (Dkt. #22, 23).[5] On April 4, 2021, Defendant filed its motion to dismiss the Amended Complaint, along with its supporting papers.  (Dkt. #29-31).  On June 21, 2021, Plaintiff filed his opposition papers.  (Dkt. #34).  On July 6, 2021,

---

[5]     Due to a docketing error, the Amended Complaint was re-filed on January 19, 2021. (Dkt. #23).

Defendant filed its reply brief.  (Dkt. #35).  Accordingly, Defendant's motion to dismiss the Amended Complaint is fully briefed and ripe for consideration.

## DISCUSSION

### A.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), a defendant may seek dismissal of a plaintiff's action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in Plaintiff['s] favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'"  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

A plaintiff will survive a motion to dismiss if the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal

9

conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks, alterations, and citation omitted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions" (citation omitted)).

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This narrow universe includes "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).

## B.   Plaintiff Has Failed to State a Claim for Municipal Liability Under Section 1983

Plaintiff brings three claims against the DOE, all pursuant to Section 1983, for deprivation of his rights under the Equal Protection Clause of the Fourteenth Amendment. "To state a claim under [Section] 1983, a plaintiff must allege two elements: [i] the violation of a right secured by the Constitution and laws of the United States; and [ii] the alleged deprivation was committed by a person acting under color of state law." *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir. 2015) (internal quotation marks and citation omitted).

Where, as here, a plaintiff brings a Section 1983 claim against a municipal agency — otherwise known as a *Monell* claim — he must also allege

that "a violation of rights resulted from the 'government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'"  *Nagle* v. *Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (quoting *Monell* v. *Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).

In this case, Plaintiff's claims rest on the theory that the DOE established and maintained a hostile work environment based on Plaintiff's race and national origin, and in retaliation for Plaintiff's complaints about such discrimination.  The Court will first address the threshold issue of whether Plaintiff has adequately alleged that the DOE may be liable for the asserted violations of his federal constitutional rights.  For the reasons that follow, the Court concludes that Plaintiff has failed to establish a basis for municipal liability.  Given that the DOE is the only named defendant in this case, this finding is determinative of this motion.

### 1.    The *Monell* Standard for Municipal Liability

The DOE is a municipal agency for the purposes of Section 1983.  *See Hurdle* v. *Bd. of Educ. of City of N.Y.*, 113 F. App'x 423, 424-25 (2d Cir. 2004) (summary order).  Under *Monell*, the DOE cannot be held vicariously liable for its employees' actions; instead a plaintiff must demonstrate that "through its *deliberate* conduct, the municipality was the 'moving force' behind the alleged injury."  *Roe* v. *City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (emphasis added) (quoting *Bd. of Cnty. Comm'rs* v. *Brown*, 520 U.S. 397, 404 (1997)).

"[T]o hold a city liable under [Section] 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three

elements: [i] an official policy or custom that [ii] causes the plaintiff to be subjected to [iii] a denial of a constitutional right." *Biehner* v. *City of New York*, No. 19 Civ. 9646 (JGK), 2021 WL 878476, at *5 (S.D.N.Y. Mar. 9, 2021) (quoting *Batista* v. *Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)); *accord Harper* v. *City of New York*, 424 F. App'x 36, 38 (2d Cir. 2011) (summary order).  As to the first prong of this analysis, a plaintiff may plead the existence of a municipal policy or custom by alleging:

> [i] an express policy or custom; [ii] an authorization of a policymaker of the unconstitutional practice; [iii] failure of the municipality to train its employees, which exhibits a "deliberate indifference" to the rights of its citizens; or [iv] a practice of the municipal employees that is "so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials."

*Biswas* v. *City of New York*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013) (quoting *Pangburn* v. *Culbertson*, 200 F.3d 65, 71-72 (2d Cir. 1999)); *accord Jones* v. *Bloomberg*, No. 14 Civ. 6402 (KPF), 2014 WL 4652669, at *2 (S.D.N.Y. Sept. 17, 2014) (dismissing Section 1983 claim against the City of New York where the "complaint lack[ed] any factual allegations suggesting the existence of an officially-adopted policy or custom that caused Plaintiff['s] injury" (internal quotation marks and alterations omitted)).  A "general and conclusory allegation" of a municipal policy or custom fails to state a *Monell* claim.  *See Littlejohn* v. *City of New York*, 795 F.3d 297, 315 (2d Cir. 2015).

### 2.    Analysis

Plaintiff asserts that the DOE should be held liable for the alleged violations of his constitutional rights under two possible theories: (i) Fanning,

as School principal, was a final policymaker "regarding all employee decisions, hirings, promotions, funding, and school activities," whose discriminatory conduct may be imputed to the DOE for purposes of Section 1983 (Am. Compl. ¶ 92; *see also* Pl. Opp. 8-10); and (ii) the discrimination was so "persistent and widespread" as to constitute the "constructive acquiescence of [DOE] policymakers" (Am. Compl. ¶ 91; *see also* Pl. Opp. 10-11).  Defendant argues that Plaintiff has asserted only boilerplate allegations of a municipal policy or custom of discrimination and that Fanning cannot be considered a final policymaker under *Monell*.  (Def. Br. 6-8; Def. Reply 3-4).  The Court finds that the allegations in the Amended Complaint fail to support either of Plaintiff's theories.

### a.    Fanning Is Not a Final Policymaker for *Monell* Purposes

Plaintiff argues that Fanning's status as a final policymaker flows from his status as School principal.  (Pl. Opp. 9-10).[6]  In Plaintiff's telling of events, Fanning possessed "complete control, oversight, and decision-making authority at the [S]chool," which power he used to subject Plaintiff to discriminatory comments, heightened scrutiny of his performance, undesirable duties, an unjustified denial of a promotion, and an overall hostile work environment based on his race and national origin.  (*Id.* at 10).  Plaintiff contends that it

---

[6]    Plaintiff concedes that his discrimination and retaliation claims are "premised predominantly on the actions of his principal, Fanning." (Pl. Opp. 9).  As such, the Court focuses its analysis of Plaintiff's "final policymaker" argument on the allegations that pertain to Fanning.

necessarily follows from these facts that the DOE may be held liable for the hostile work environment that Fanning propagated.  (*Id.* at 10-11).

Defendant counters that "the mere fact that … Principal Fanning is alleged to be a final decision maker at the [S]chool does not somehow make him a final *policymaker* for *Monell* purposes."  (Def. Br. 8 (emphasis in original); *see also* Def. Reply 3-4 (collecting cases within the Second Circuit finding school principals not to be final policymakers)).  Rather, Defendant urges that the hallmark of a final policymaker is "whether the municipal official has the authority to formulate the rules governing personnel decisions rather than the authority to make decisions pursuant to those rules — *e.g.*, the hiring and firing of subordinates."  (Def. Br. 8 (citing *Chin* v. *N.Y.C. Hous. Auth.*, 575 F. Supp. 2d 554, 562 (S.D.N.Y. 2008))).

The Court finds Defendant's position to accord with the Second Circuit's approach to determining final policymaker status.  Under *Monell*, "a municipality may be liable for the acts of a single official — but only if that official is someone 'whose edicts or acts may fairly be said to represent official policy' for the entire municipality."  *Agosto* v. *N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (quoting *Monell*, 436 U.S. at 694); *see also Santos* v. *New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) ("[T]he single act of a municipal policymaker, *i.e.*, a person with the authority to set municipal policy, can constitute official policy, and thus, can give rise to municipal liability." (citing *Pembaur* v. *Cincinnati*, 475 U.S. 469, 480 (1986))).  Authority to set municipal policy resides in "the official or officials responsible for establishing

*final* policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483 (emphasis added) (citation omitted); *see also Jeffes* v. *Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to [Section] 1983 liability." (citation omitted)).  Final policymaking authority requires that the official be vested with responsibility under state law for making policy in that area of the municipality's business, which entails more than just the power to make an unreviewable decision.  *See Agosto,* 982 F.3d at 98 (citing *Walker* v. *City of New York*, 974 F.2d 293, 297 (2d Cir. 1992), and *Anthony* v. *City of New York*, 339 F.3d 129, 139 (2d Cir. 2003)).  "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law[.]" *Jeffes*, 208 F.3d at 57 (citations omitted).

In reaching the conclusion that Fanning is not a final policymaker, the Court is guided by the Second Circuit's recent decision in *Agosto* v. *New York City Department of Education,* which rejected the theory that "a public school principal acts as a final policymaker to the extent that the ultimate harm that befell the plaintiff was under the principal's control."  982 F.3d at 100-01.  In eschewing this theory, the *Agosto* panel cautioned against "erroneously equating a principal's final decisions with a municipality's final policies[.]"  *Id.* The application of that principle here demonstrates that Fanning is not a final policymaker.

15

Plaintiff fails to point to any legal authority to suggest that Fanning, as principal of A.P. Randolph High School, had the power to set DOE policy in any relevant respect.  Contrary to Plaintiff's contention that Fanning "had complete control, oversight, and decision-making authority at the school" (Pl. Opp. 10), New York law establishes that the authority of New York City school principals over "the day to day operation of the school" is "[s]ubject to the regulations of the chancellor[.]"  N.Y. Educ. Law § 2590-i.  And with respect to such regulations, New York law vests the chancellor with expansive authority to set policy for and to "[c]ontrol and operate … academic and vocational senior high schools[.]"  *Id.* § 2590-h(1); *see also Agosto*, 982 F.3d at 98-99 (explaining that "[b]ecause state law invests the chancellor with such authority, New York's highest court has held that 'the city board [of education] and the Chancellor are responsible for policy having city-wide impact'" (quoting *N.Y.C. Sch. Bds. Ass'n* v. *Bd. of Educ. of City Sch. Dist.*, 39 N.Y.2d 111,119 (1976)).  Without any support in state law for his claim that Fanning's discriminatory comments, excessive surveillance, or employment decisions were performed pursuant to a municipal policy, Plaintiff's claim that Fanning was a final policymaker must fail.  *See Agosto*, 982 F.3d at 99 ("Because the chancellor appears to be the final policymaker for the [DOE] with respect to teacher discipline and school administration, [plaintiff] has difficulty articulating precisely how a school principal … could have established municipal policy."); *see also Kuperman* v. *City of New York*, No. 20 Civ. 6834 (LTS) (DCF), 2021 WL 4442855, at *5 (S.D.N.Y. Sept. 28, 2021) (citing *Agosto* for the proposition that "school

principals are as a matter of law not 'final policymaker[s]' for the New York City Department of Education for purposes of *Monell*").

Plaintiff attempts to save his claim by pointing to both his contention that Fanning's actions as principal "were not reviewable by any higher authority" (Pl. Opp. 9), and a line of district court cases within the Second Circuit that found school principals to have a sufficient degree of decisional authority in a public school's day-to-day operations to confer final policymaking status under *Monell* (*id.* at 9-10 (collecting cases)).  But, as *Agosto* clarified, this argument erroneously conflates a final *decisionmaker* with a final *policymaker*.  *See Agosto*, 982 F.3d at 100 ("[B]y equating a final decisionmaker with a final policymaker, [plaintiff's] approach would effectively impose *respondeat superior* liability — making the municipality liable for the conduct of its employees — in violation of *Monell* itself."); *cf. Buchanan* v. *City of New York*, No. 21 Civ. 660 (SHS), — F. Supp. 3d —, 2021 WL 3726963, at *11 (S.D.N.Y. Aug. 23, 2021) (finding the actions of an executive director of the New York City Civilian Complaint Review Board ("CCRB"), who possessed final decisionmaking authority over CCRB employment matters, to be insufficient to confer *Monell* liability because his "personnel decisions cannot be considered to 'represent official policy' for the municipality" (citing *Monell*, 436 U.S. at 694)).  Furthermore, the Second Circuit explicitly declined to adopt the approach taken in Plaintiff's cited cases — indeed, the panel specifically disavowed eight of the eleven cases Plaintiff cited for this proposition (*see* Pl. Opp. 9-10).  *See Agosto*, 982 F.3d at 100 n.7, 100-01.  In finding these cases to be inconsistent

17

with *Monell*, the *Agosto* panel reasoned that deeming a principal to be a final policymaker "to the extent that the ultimate harm that befell the plaintiff was under the principal's control" runs the untenable risk of "imposing *Monell* liability for almost every action a principal takes."  *Id.* at 100-01.

Thus, the Court finds that Plaintiff has failed to allege that Fanning was a final policymaker for purposes of *Monell* liability.

### b.   The DOE Has Not "Constructively Acquiesced" in a Municipal Policy or Custom of Discrimination

Plaintiff separately argues that even if Fanning were not a final policymaker, the DOE may be held liable on the basis of its "constructive acquiescence" in the discriminatory conduct of its subordinate employees.  (*See* Pl. Opp. 9).  Focusing on Fanning's behavior, Plaintiff alleges that despite knowledge of the discrimination endured by Plaintiff and other minority faculty, the DOE "has permitted Fanning to continue as Principal at the School with[out] reprisal for his actions, thereby tacitly condoning the discrimination, harassment, and retaliation experienced by Plaintiff and other minority employees."  (Am. Compl. ¶ 96; *see also* Pl. Opp. 10-11 ("[T]he DOE has been aware of such behaviors … but has done nothing to remedy the issue thereby permitting Fanning to institute discriminatory rule over the School.")).

As support for the DOE's awareness of Fanning's pattern of discrimination, Plaintiff points to Fanning's "noted and public history of discriminating against Black and other minority personnel at the school," which has generated "multiple lawsuits" against the DOE.  (Am. Compl. ¶ 94).  Plaintiff further asserts that he is "at *least* the fifth employee at the School to

18

complain that he had been discriminated and/or retaliated against at the School and/or directly by Fanning[.]"  (Pl. Opp. 11 (emphasis in original); *see also* Am. Compl. ¶ 95).  Defendant does not concede the point and argues that Plaintiff has not pleaded facts to support the theory that "Principal Fanning or Supervisor Pekow acted 'pursuant to a longstanding practice or custom' of DOE[.]"  (Def. Reply 4).

"While 'isolated acts by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify liability,' [the Second Circuit has] recognized that 'they can be the basis of liability if they ... were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisors must have been aware.'"  *Hu* v. *City of New York*, 927 F.3d 81, 105-06 (2d Cir. 2019) (quoting *Matusick* v. *Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014)).  To prevail on such a theory, the unconstitutional conduct must be "so manifest as to imply the constructive acquiescence of senior policy-making officials."  *Lucente* v. *Cnty. of Suffolk*, 980 F.3d 284, 297-98 (2d Cir. 2020) (quoting *Sorlucco* v. *N.Y.C. Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)).  "[T]here must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'"  *Id.* at 298 (quoting *Jones* v. *Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012)).  "It is only at that point that, although not expressly authorized, the unconstitutional conduct is so

persistent and widespread that it can constitute a custom or usage of which a supervising policymaker must have been aware." *Id.* (citation omitted).

Here, the Court finds that Plaintiff's allegations are neither sufficiently widespread nor manifest to plausibly allege that the DOE constructively acquiesced in an official policy or custom of discrimination and retaliation at the School. *First*, although the Amended Complaint alleges that Fanning engaged in several forms of discriminatory behavior *vis-à-vis* Plaintiff, it fails to allege a basis to infer that any senior policymaking official at the DOE had knowledge of the conduct complained of by Plaintiff. For instance, Plaintiff does not explain how conduct such as "lurk[ing] outside of Plaintiff's classroom and tr[ying] to eavesdrop on [Plaintiff's] lessons" (Am. Compl. ¶ 45); unfairly "continu[ing] to choose [Plaintiff] twice a year to handle grading the Regents exams" (*id.* at ¶ 54); or "refus[ing] to reach out to [Plaintiff] out of disdain" after Plaintiff had intervened in a violent altercation between students (*id.* at ¶ 58) can plausibly constitute discrimination or retaliation "so manifest as to imply the constructive acquiescence of senior policymaking officials." *Lucente*, 980 F.3d at 297-98.

*Second*, Plaintiff's allegations of Fanning's discrimination against others are too generalized to support Plaintiff's constructive acquiescence theory. In his most specific allegation to this effect, Plaintiff asserts that "multiple faculty members, including Chantise Hogue and Mr. Westbrook [both of whom are African-American] ... have paid dire consequences" as a result of speaking "out against Fanning's discriminatory behavior in various ways." (Am. Compl.

¶ 87).  But without any elaboration whatsoever on the "various ways" these aggrieved faculty members complained, the individuals to whom they complained, or the "dire consequences" they faced for complaining, the allegation is far too general and conclusory to permit the inference of a municipal policy of discrimination or retaliation based on inaction by the DOE.  *See Green* v. *Dep't of Educ. of City of N.Y.*, No. 20-3785, — F.4th —, 2021 WL 5022654, at *4 (2d Cir. Oct. 29, 2021) (citing *Littlejohn*, 795 F.3d at 315, in affirming dismissal of complaint); *cf. Jones* v. *Town of E. Haven*, 691 F.3d at 85 (reversing denial of motion for judgment as a matter of law where the "evidence fell far short of showing a policy, custom or usage of officers to abuse the rights of black people, and far short of showing abusive conduct among officers so persistent that it must have been known to supervisory authorities").

*Finally*, the Court finds Plaintiff's allegations concerning other colleagues' complaints about Fanning's conduct to be too vague to permit a plausible inference that the DOE constructively acquiesced in a policy of discrimination at the School.  Plaintiff claims that he is at least the fifth employee who has complained about discrimination and retaliation at the School, but the Court refused to credit virtually identical allegations made in Plaintiff's original Complaint for his failure to "actually plead any facts to support the allegation that these individuals were in fact subject to any discrimination, or that their treatment was similar to Plaintiff's complained-of discrimination in any way" *Rivera I*, 2020 WL 7496282, at *8 n.4.  The Amended Complaint suffers from this same defect, as Plaintiff again "simply lists four names and makes a

conclusory allegation that they 'complained about' discrimination of some kind at an unspecified time." *Id.* This is not sufficient to suggest that the DOE, itself, tolerated, as a matter of policy or custom, violations of the constitutional rights of School employees.

Along similar lines, Plaintiff claims that Fanning's conduct "has been the impetus for multiple lawsuits against [the DOE]." (Am. Compl. ¶ 94). But this mere gesture at the "multiple lawsuits" generated by Fanning's conduct does not plausibly suggest that the alleged discrimination at the School "represent[ed] the conscious choices of the municipality itself." *Amnesty Am.* v. *Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004). Notably, Plaintiff does not provide any indication as to whether any of these suits "resulted in an adjudication of liability," as the unsubstantiated allegations in a lawsuit does not necessarily indicate the actual existence of a widespread municipal policy or practice. *Tieman* v. *City of Newburgh*, No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (citing *Walker* v. *City of New York,* No. 12 Civ. 5902 (PAC), 2014 WL 1259618, at *3 (S.D.N.Y. Mar. 18, 2014)). Without any context for whether these nameless suits brought by unspecified plaintiffs actually put the DOE on notice of Fanning's conduct at the School, the Court finds they cannot support Plaintiff's theory that the DOE constructively acquiesced in a constitutionally infirm policy. *See id.* at *17 (finding the existence of nine suits, filed over the course of five years, even when combined with other allegations, to be "insufficient to plausibly support an inference of a widespread custom"); *cf. Collins* v. *City of New York,* 923 F.

Supp. 2d 462, 479 (E.D.N.Y. 2013) (finding a "litany of other police-misconduct cases" cited by Plaintiff to be "insufficient to make a plausible case for *Monell* liability," because they either differed from the misconduct alleged in the complaint, post-dated the misconduct alleged by plaintiff, or "involve[d] something less (settlements without admissions of liability and unproven allegations) than evidence of misconduct").

In sum, the Amended Complaint fails to plausibly allege that the DOE "acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds* v. *Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citation omitted).  At base, Plaintiff seeks to hold the DOE liable for the unconstitutional behavior of a subordinate employee under an impermissible vicarious liability theory.  *See Jallow* v. *City of New York*, No. 21-1267, 2021 WL 5121130, at *2 (2d Cir. Nov. 4, 2021) (summary order) ("[G]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*, which is, at bottom, [plaintiff's] theory of municipal liability." (internal quotation marks and citation omitted)).[7]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Amended Complaint is granted.  Plaintiff has not requested leave to file a Second Amended Complaint.  And in light of the guidance this Court provided in *Rivera*

---

[7]    Because the Court has determined that Plaintiff has failed to plead a basis for *Monell* liability, Plaintiff's Section 1983 claims against the DOE cannot go forward, even if he has adequately alleged a deprivation of his constitutional rights.  As such, the Court need not address whether Plaintiff has satisfied the pleading standard for his hostile work environment claims.

*I* regarding the filing of amended pleadings, the Court does not believe further amendment would remedy the pleading deficiencies outlined in this Opinion. *See Binn* v. *Bernstein*, No. 19 Civ. 6122 (GHW) (SLC), 2020 WL 4550312, at *34 (S.D.N.Y. July 13, 2020) ("To grant Plaintiffs leave to amend would be allowing them a 'third bite at the apple,' which courts in this district routinely deny." (collecting cases)), *report and recommendation adopted*, 2020 WL 4547167 (S.D.N.Y. Aug. 6, 2020); *see generally Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (noting that "it remains 'proper to deny leave to replead where ... amendment would be futile'" (citing *Hunt* v. *Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998))).  Accordingly, Plaintiff's claims against the DOE are dismissed with prejudice.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     November 18, 2021
           New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge